Good morning and may it please the court. The complaint that was filed in the Eubanks case pleaded a claim to relief that was plausible on its face. The complaint satisfied the two exceptions under the shaming where there was first a special relationship that was pled in the complaint between the children, Jace, and the city. In this case, there was police as well as ACS workers that are employees that took the children as well as Jace's mom and Jace's mother's boyfriend to an ACS office in Brooklyn. That act effectively put the children in the custody of the city. When that happened... Why do you say that? How did they come to be under the custody of the city? They were then sent home with their parents at the end of that day or with the mother and the mother's boyfriend. Right, Your Honor. With regard to the complaint, looked at in the light most favorable, when this four-year-old and his five-year-old brother were taken to the ACS office, they were removed from their own home. Along with the mother and her boyfriend. I mean, they weren't taken away from their custodians. In the light most favorable, the questioning of the children when it occurred at this ACS office removed the parents from the children so that the children could be... They were questioned separately. They were questioned separately. And that effectively acted as a custodial effect. Well, I mean, that stretches the word custodial a bit far, doesn't it? Any time that an ACS investigation occurs and there's a questioning of the children because it's a standard procedure, that would be a custodial change? I think when you add, Your Honor, when you add in the fact that there were police involved, that there were police officers involved that removed these children from their home... Isn't that exactly what happened? It is not. So what happened in Deshaney, the child in Deshaney was taken away. He was put into temporary custody. But in that case, you were talking about... Was there an order of removal here? I'm sorry? Was there an order of removal here? There was no order of removal, but... So there's no custodial change in terms of context of the law, right? I think that the complaint looked at in the light most favorable does establish that. And the reason it does is because unlike in... First of all, unlike in Deshaney, Johnson, in this case, was not the father, was not the biological father. And so one of the concerns that the court raised in Deshaney was this catch-22, where if you remove a child from the parent... But that doesn't change that tension that child care protective workers have, the tension of whether to remove a child, whether to exercise a 72-hour hold, 96-hour hold, whatever the particular state's statute allows, whether to remove the child and to take custody, or whether to leave them with a legal custodian, whether that be a biological parent or someone else. Here, that same challenge occurred. Do they leave the children with their biological mother, or do they remove them temporarily from custody? I don't see how Deshaney helps your case. I think Deshaney, the factual scenario there, is much worse. They actually removed the child for a time period. They gave the child back. This went over a period of months, over a year, of multiple complaints of abuse. This spans a period of three days. So I'm struggling to see how Deshaney helps your argument. In our complaint, unlike in Deshaney, the police and the ACS employees made a promise to our client, saying that they would protect them from harm. Well, how would that affect, for example, a confidential informant who has been under arrest, is released on bail or given some sentencing relief, released into the community, on the understanding that the police will try to take care of him? Is that a special relationship? Well, the court did not find that in Manikin. Exactly. So I'm wondering why that's different. I understand children are different. But at the same time, what you're largely relying on is the promise, the somewhat feckless and not followed-through-on promise that we'll take care of you, we'll protect you. Well, there's a difference, though, with Manikin, Your Honor, and if I could explain. With Manikin, the informant acted willfully, volunteered to serve in that capacity as an informant. Here the children – Well, that's all very well. I understand that. But that's not really relevant to the question of does the police establish a relationship with someone that takes a case out of Descheny by a promise to be protective? And in that case, that wasn't enough. That wasn't enough. Well, I think in this case there are a couple of differences. First, you have the removal, which we talked about, the promise to protect, which we talked about. And we also talk about the lack of the familial relationship. There was no reason that when releasing Jace and his brother back home, that they could have insisted that the mother not allow or that the boyfriend, Johnson, not be permitted. Was there any evidence that the authorities had that it was the boyfriend rather than the mother who was guilty of the abuse? I think in the light most favorable. Well, what is the allegation? What is alleged about that? What is alleged about what the authorities knew? I thought the problem that the ACS people had was there were signs of abuse. It seems to me a reasonable inference that someone in the household must have committed that abuse. But they didn't actually have anyone, including the children, saying that it was the boyfriend. I guess they also have the inference. You're relying on the inference from his past history? Exactly. There was a whole history that they were aware of where there were outstanding warrants against Johnson for domestic violence, for child abuse. There were open cases. And yet they released the children back into essentially his care. And so that is much different than what we had in Deshaney, where in Deshaney the father did not have that same history. He did not have open cases of domestic violence, of child abuse. He did not have that. And when the Deshaney child was released back to his care, there was a plan in place for that child, I should say for the father, to get training and to have other assistance in raising the child. Here there was none of that. And in fact, I guess we're getting into the state created danger argument. In fact, what was done was affirmative action on the part of the defendants here, stating essentially to Johnson that notwithstanding your past, notwithstanding the fact that you have open warrants, notwithstanding the fact that there are open cases of child abuse, we're not going to take any action. And that gave him the belief that he could—it emboldened him to go from bad to worse in just a matter of days, that he went from bad to worse, and that's where the state created danger comes in, much different than Deshaney. And I think if the court looks at the complaint as just setting forth a plausible claim to relief, that this complaint has done it. Yes, you have reserved two minutes for rebuttal. Thank you very much. May it please the court, my name is Jameson Babies for the appellees. This court should affirm, while the circumstances of this case are undoubtedly tragic, the Supreme Court and this court's precedents foreclose the plaintiff's claim. Deshaney and all the cases that follow it provide that government enemies are not liable for failing to prevent private violence in almost all circumstances. Neither the exceptions to that general rule, the state-created danger doctrine, or the special relationship doctrine, only one of which the plaintiff raised below, applies here. Moreover, even if one of those exceptions did apply, there's no allegation sufficient to meet the high bar of conscious shocking conduct. Caseworkers make difficult balancing decisions between the risk of harm to a child and the certain deprivation of parental rights if they intervene to remove the child all the time. In 1983, liability is not attached, and circumstances far more egregious than those present here. At a minimum, this court has not clearly established that intervention was absolutely required under the circumstances here, entitling the defendants to qualified immunity. And finally, the district court correctly dismissed the Minnell claims. Turning to the... Can I just ask you a question with respect to the qualified immunity claim? If we were to find that the plaintiff has established an underlying substantive due process violation, if we were to find that, would the New York PD defendants, as opposed to the ACS defendants, be entitled to qualified immunity? I think they would still be entitled to qualified immunity. I think there's even less of an allegation as to what the NYPD defendants, what clearly established law they violated here. You know, there's no equivalent case. The plaintiff has not identified any equivalent case requiring removal in these circumstances. You know, it's only the allegations and the complaint, but as far as I'm aware, the NYPD's job is basically just to facilitate the transfer of the children to the ACS office for the interview. Thank you. And just one other question I have for you is we talked a lot about the special relationship during your opponent's portion of the argument. We didn't get into the state-created danger exception and whether it applies. Given the amended complaint's allegations that the defendants explicitly communicated to Johnson, I guess, that he could punish children with impunity, do you believe that exception applies? I think the state-created danger exception does not apply. If you look at the allegations and the complaint, it's still quite conclusory. It says they either implicitly and or explicitly communicated to him. But I think regardless, it doesn't reach the level that this court has found in other cases where it's been repeated inaction over the course of 18 911 calls. It's been explicit communications while someone is beating somebody up in the Duarez case. Actual content of communications. Correct, Your Honor, correct, where there was an actual, I think in that case at that point, undisputed allegation that the police had said, you know, as long as you don't go too far, we're not going to intervene. Well, I'm not sure I would go so far as to say if the allegation and the complaint were flatly that this was explicitly communicated, you know, short of that being a falsehood, a conscious falsehood by an attorney, why wouldn't that be enough? The allegation were he was told by the ACS workers that physical punishment was okay. That would be a different case than this one. It seems to me the explicitly and or implicitly undermines the whole thing. I agree, Your Honor, and I think it would be a far different case if it was explicitly. And it would also depend, you know, on the content of the communications, what was actually alleged to have been said. You know, if they said that you can punish a child physically, that would be, you know, probably close to the line if it had been communicated that he could do whatever he wanted. That would be even further. Even further, right, of course, right. I mean, if there were, the idealized allegation would be a quotation of specific words. But to say he was explicitly told he could act with impunity, I'm not sure that's entirely credible because it doesn't sound like the way people speak. But if that was what was alleged, that gets a lot, is a lot less conclusory. But to say he was either told or given the impression that, that seems to me to be the essence of a conclusory allegation that doesn't really say much of anything. I agree, Your Honor. I think the allegation is really crafted to try to meet the test here. But the allegation is conclusory. It doesn't talk about what the officers actually conveyed. It just gives a conclusory allegation that, you know, they were explicitly and or implicitly communicated to that they could do that. Right, because the allegation leaves open essentially the idea that the very fact that they released him gave him the impression he could act with impunity. And if that's the case, then we're somewhat back in the world of they didn't act, and that's what the problem is. Exactly, Your Honor. And I think the Supreme Court and this Court have been very careful to police that line to avoid the Constitution becoming, you know, what the Supreme Court described as a fond of tort law. Every negligent failure to act does not rise the level of a substantive due process violation. Substantive due process is an extremely high bar to meet, a high bar to plead. And it just isn't met here. I think even if one of the exceptions did apply, it still hasn't risen to the level of conscious shocking conduct. We talk about this a lot in the brief, but it's, you know, essentially the ACS workers are operating under uncertain circumstances. They're still at this point very early in their investigation. You know, they generally will investigate over a period of at least a month. So they're going through their usual practice. And in these circumstances, just the failure to remove the child, especially in light of what we were talking about before where there wasn't any real evidence as to who was potentially responsible for the abuse. There was an inference that could be made, but not a direct allegation. There's just the ACS's failure to remove the child from his mother at that point does not rise the level of conscious shocking conduct. Is there an allegation that the police officers knew about the warrants? I think there is a conclusory allegation that the defendants, I think, knew or should have known about the warrants. I don't think there is an allegation. We don't have a record here, of course, because it's on a 12B6 motion, but it is somewhat peculiar that someone in this situation is put aside taking the child away. Why a person with an outstanding warrant was not arrested and made to answer for whatever the warrant is out for. Right. I agree with that, Your Honor. I think it is a little bit of a different circumstance than a usual outstanding warrant because as it's pled in the complaint, the warrant was for violating order of protection, so it wasn't for a felony or a more serious crime. It was, I think, a bench warrant. So I understand it, at least from the allegation in the complaint. Does it strike you as odd that given the fact that the child presented bruises and other indications of abuse, the fact that they couldn't really you said this in response to Judge Lynch's question, the fact that there was no initial indication of who might be responsible, that they just didn't simply remove the child? Why should the child remain in anyone's home if there is some indication of abuse, but you can't identify the abuser? Why does the child have to stay at risk? Doesn't that seem like an odd choice? In hindsight, I think obviously we all wish that the ACS had made a different choice, but in the circumstances, the ACS faces competing burdens between removing the child from the parents. Well, they took the child and they took the child, separated it from her mother and her boyfriend for the purpose of examining the child, right? Correct. And after they examined the child, they discovered indications of abuse. So now they put the child back into harm's way because they don't know who's doing it? Well, I think that's what you tell the parent of a dead child. I mean, obviously I wish they would have removed the child, but I think ACS has also been under a lot of pressure and investigation for removing children too quickly. It was conducting the investigation still. These investigations are conducted usually over the course of 30 days. I just find it curious that they think there might be abuse there, but then the answer is to put the child back into potentially harm's way. The question is whether this fits with DeShaney or not, and that's what we'll have to answer. Correct, Your Honor. I think in DeShaney, if you look at DeShaney, the allegations are much worse. They had removed the child previously from the father's care. There was, I think, substantiated that he was in fact the one who was abusing the child, and the Supreme Court still said there's no liability under the substance abuse process. Thank you, Your Honor. Thank you. Attorney Sells, you have two minutes for rebuttal. Thank you. If I could just start where the argument just ended. The difference, again, with DeShaney versus Eubanks, here we're not talking about the biological father, Johnson. And one of the things that DeShaney focused on was the fact that there was this catch-22. Here there was no catch-22. There was no reason that in terms of the state-created danger, there was no reason that the city could not act to keep the children away from Johnson. And that is really, in our view, one of the significant points. Does the city have enough? Is it lawful? Does the ACS have the authority to tell a person that he can't live in that house anymore? It's my understanding that they can. There are certain procedures that they have where they could actually remove children until the children are put into a safe. Oh, sure, they can remove the children, but then you have the problem of the biological mother. I mean, you're suggesting they do not have the usual tension between getting sued for disrupting the custody of a biological parent and legal custodian and leaving the child in a situation of danger and then getting sued for doing that. And you're saying that's not the problem here because they did not have a biological father in the household. But what about the biological mother? And your response, I thought, was, well, they could have separated out Mr. Johnson from the household. And, you know, I just hadn't heard of that as a possible remedy and was wondering if that is something that they can do to order the mother, you can't let this guy in the house, or to order him to stay away. Well, the record in this case, the complaint in this case, sets forth, I believe, facts that you could infer that Johnson had already been prohibited from going into other domestic situations with children. There's already been stay-away orders that he violated. There's already been... Anyway, I think, isn't the thing that you are arguing is that what they should have done is taken the children away? And got in a court order preventing Johnson from going into the household, which had been done previously and which they knew had been done previously. There was no reason that they could not have taken that action. And that is the significant difference between Descheny and this case. We're not talking about a biological father. And if you look at the light, if you look at the facts... Isn't the holding of Descheny, the holding of Descheny doesn't turn on any of that, right? The holding of Descheny is there is no duty to protect citizens. The duty imposed by the Due Process Clause is against the state inflicting harm. That's the holding. It's not... Whatever the specific facts, whether Descheny is worse than this or less bad than this in terms of the facts of the abuse and how poor the decision-making was, what the Supreme Court said is that you have to find some affirmative act by the state. What I'm saying here is that the state-created danger doctrine is worse in Eubanks because one of the bases upon which the Supreme Court said that the Wisconsin state entity agency put the child back with the father was because of the biological relationship. And I'm saying here Johnson was not... There was no competing interest under the 14th Amendment. He should have been precluded from seeing those children before the children were put back into that space. Thank you. Thank you to both counsel. And we will take this matter, reserve decision on this matter.